[*Parties Listed On Signature Page*]

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PANAVISION IMAGING, LLC, <br><br> Plaintiff, <br><br> v. <br><br> OMNIVISION TECHNOLOGIES, INC., CANON U.S.A., INC., MICRON TECHNOLOGY, INC., APTINA IMAGING CORPORATION, and APTINA, LLC, <br><br> Defendants. | Case No. CV 09-1577 MRP (CTx) <br><br> **DEFENDANTS' OPENING SUPPLEMENTAL CLAIM CONSTRUCTION BRIEF FOR U.S. PATENT NO. 6,818,877** <br><br> Date:  January 27, 2011 <br> Time:  10:00 a.m. <br> Dep't:  Courtroom 12 <br> Before:  Hon. Mariana R. Pfaelzer |

# TABLE OF CONTENTS

                                          **Page**

I.    INTRODUCTION ................................................................................... 1

II.    LEGAL PRINCIPLES ........................................................................... 1

    A.    Inventor Testimony Is Relevant To Claim Construction .................... 1

    B.    Statements Made By A Patent Owner During A Reexamination May Limit The Scope Of The Claims ................................................ 2

III.    ARGUMENT .......................................................................................... 3

    A.    Conductive Channel ............................................................................ 3

    B.    Column .................................................................................................. 4

    C.    Column Output Amplifiers, Each Connected with a Selected Pixel of its Associated Column, and Having a Low-Impedance Amplifier Device ................................................................................ 5

    D.    A Pre-Charging High-Impedance Pull-Up Amplifier .......................... 6

        1.    The Asserted Claims Are Indefinite Because The Patent Does Not Provide Any Basis For Determining The Scope Of The High-Impedance Limitation ............................................ 7

        2.    Panavision Disclaimed A Switch As Having A Low Impedance ................................................................................ 8

        3.    Pre-Charging Must Occur Before A Column Output Amplifier Is Connected To The Conductive Channel ................ 9

    E.    Periodically Charging Up the One or More Conductive Channels Between Connections of Said Switching Means .................. 9

    F.    Switching means for selectively connecting outputs of the column amplifiers to said one or more conductive channels ............. 10

# TABLE OF AUTHORITIES

Page

**FEDERAL CASES**

*Athletic Alternatives, Inc. v. Prince Mfg., Inc.*,
　73 F.3d 1573 (Fed. Cir. 1996) ................................................................................ 7

*Atmel Corp. v. Info. Storage D-evices , Inc.*,
　198 F.3d 1374 (Fed. Cir. 1999) .............................................................................. 7

*Biomedino, LLC v. Waters Techs. Corp.*,
　490 F.3d 946 (Fed. Cir. 2007) ................................................................................ 7

*Civix-DDI, LLC v. Hotels.Com, L.P.*,
　No. 05-C-06869, 2010 WL 4386475
　(N.D. Ill.  Oct. 25, 2010) ........................................................................................ 2

*Computer Docking Station Corp. v. Dell, Inc.*,
　519 F.3d 1366 (Fed. Cir. 2008) .............................................................................. 2

*Datamize LLC. v. Plumtree Software, Inc.*,
　417 F.3d 1342 (Fed. Cir. 2005) .............................................................................. 7

*Halliburton Energy Services, Inc. v. M-I LLC*,
　514 F.3d 1244 (Fed. Cir. 2008) .............................................................................. 7

*Howmedica Osteonics Corp. v. Wright Medical Tech., Inc.*,
　540 F.3d 1337 (Fed. Cir. 2008) ......................................................................... 2, 3

*OrthoArm, Inc. v. Forestadent USA, Inc.*,
　502 F. Supp. 2d 968 (E.D. Mo. 2007) .................................................................... 2

*Phillips v. AWH Corp.*,
　415 F.3d 1303 (Fed. Cir. 2005) .............................................................................. 2

*Spectrum Int'l v. Sterilite Corp., Inc.*,
　164 F.3d 1372 (Fed. Cir. 1998) .............................................................................. 3

# TABLE OF AUTHORITIES
(continued)

**Page**

*Sun Microsystems Inc. v. Network Appliance*,
   No. C-08-01641, 2009 WL 1513384 (N.D. Cal. May 29, 2009) ......................... 2

*Voice Techs. Group, Inc. v. VMC Sys., Inc.*,
   164 F.3d 605 (Fed. Cir. 1999) ................................................................................ 1

## FEDERAL STATUTES

35 U.S.C. § 112, ¶ 2 ................................................................................................ 5,6

## I. INTRODUCTION

As demonstrated in Defendants' prior claim construction brief dated November 5, 2009 (Dkt. No. 105), Defendants' proposed claim constructions for U.S. Patent No. 6,818,877 ("the '877 Patent") are consistent with how one of ordinary skill in the art would understand the disputed terms in view of the claim language, the specification, and the prosecution history.  Since Defendants' prior brief was filed, the '877 Patent became the subject of a reexamination pending before the U.S. Patent Office and the sole named inventor of the '877 Patent – Christian Boemler – was deposed.  Both inventor Boemler's testimony and Panavision's assertions to the Patent Office during the reexamination confirm that Defendants' proposed constructions are consistent with how one of ordinary skill in the art would understand the disputed terms in view of the specification and prosecution history.  In contrast, Panavision's overly broad proposals ignore the disclaimers of claim scope that Panavision made during reexamination to overcome prior art rejections and are inconsistent with what the inventor testified was intended to be claimed.

## II. LEGAL PRINCIPLES

### A. Inventor Testimony Is Relevant To Claim Construction

It is well established that inventor testimony may be considered, including during claim construction, because the inventor is a "competent witness to explain the invention and what was intended to be conveyed by the specification and covered by the claims." *Voice Techs. Group, Inc. v. VMC Sys., Inc.*, 164 F.3d 605, 615 (Fed. Cir. 1999) (affirming a "large body of precedent that recognizes the value of the inventor's testimony" during claim construction).  Courts also often rely on inventor testimony to understand the background of the patent, including "the problems that existed at the time the invention was made and the inventor's solution to these problems." *Voice Techs.*, 164 F.3d at 615.  As a result, courts will consider inventor testimony, along with the intrinsic record, when construing

disputed terms to understand the technology and what was intended to be claimed. *See, e.g.*, *OrthoArm, Inc. v. Forestadent USA, Inc.*, 502 F. Supp. 2d 968, 974 (E.D. Mo. 2007) (considering inventor testimony when construing the claims for the "permissible purposes" of understanding the invention and what was intended to be conveyed by the specification and covered by the claims).

Inventor testimony also is significant during claim construction in determining "the established meaning of particular terms in the relevant art." *See Howmedica Osteonics Corp. v. Wright Medical Tech., Inc.*, 540 F.3d 1337, 1347 n.5 (Fed. Cir. 2008) (citing *Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005) (*en banc*)). Consequently, courts will consider inventor testimony in determining how one of ordinary skill in the art would have understood a claim term during the relevant time frame. *See, e.g.*, *Sun Microsystems Inc. v. Network Appliance*, No. C-08-01641, 2009 WL 1513384, at *14 (N.D. Cal. May 29, 2009) (considering inventor testimony as probative of the meaning of a disputed term during claim construction); *Civix-DDI, LLC v. Hotels.Com, L.P.*, No. 05-C-06869, 2010 WL 4386475, at *13-14 (N.D. Ill. Oct. 25, 2010) (same).

### B.  Statements Made By A Patent Owner During A Reexamination May Limit The Scope Of The Claims

When a patent applicant distinguishes the claimed invention during prosecution based on the absence of a particular feature or structure from the prior art, the applicant disclaims that feature or structure from the scope of the claims. *Chimie v. PPG Indus.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005) ("[C]laims [should] not [be] construed one way in order to obtain their allowance and in a different way against accused infringers."); *see also Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1374 (Fed. Cir. 2008) ("[A] patentee may limit the meaning of a claim term by . . . clearly characterizing the invention in a way to try to overcome rejections based on prior art."). It is well established that this principle of prosecution history disclaimer applies with "equal force" to a patent owner's

1  arguments during a reexamination. *See, e.g., Spectrum Int'l v. Sterilite Corp., Inc.*,
2  164 F.3d 1372, 1379 (Fed. Cir. 1998).

3  Panavision agrees that a disclaimer attaches to "clear and unmistakable"
4  disclaiming statements. Panavision Reply Brief (Dkt. No. 112) at 2.

5  **III.  ARGUMENT**

6  Inventor Boemler's testimony and Panavision's own statements to the Patent
7  Office during reexamination confirm that Defendants' proposed constructions are
8  consistent with how one of ordinary skill in the art would understand the disputed
9  terms. Defendants are *not* offering inventor Boemler's testimony to change the
10 scope or meaning of the claims as Panavision may contend. *See Howmedica*, 540
11 F.3d at 1346. Rather, Defendants are offering inventor testimony to assist the Court
12 in understanding the invention as described in the specification and prosecution
13 history and the established meaning of the disputed terms in the art. *Id.* at 1347 n.5.

14 In particular, inventor Boemler's testimony confirms that one of ordinary
15 skill in the art would understand that the '877 Patent is directed to pre-charging a
16 shared signal line onto which signals from an array of pixels are transferred for
17 processing. *See, e.g.*, Exh. 9 (Boemler Depo. Tr.) at 21:24-22:15. As both the
18 patent and inventor Boemler explain, this is accomplished by using a "*pull-up*" to
19 reset the shared line to a reference voltage between each connection of a "column
20 output amplifier" to the shared line. Exh. 1 at 2:40-60;[1] Exh. 9 at 63:3-64:17.

---

[1] Exhibits 1-8 cited herein can be found in the Declaration of Scott Kanalakis dated October 15, 2009 ("Dkt. No. 100").

| A. | Conductive Channel |
|---|---|
| Panavision | Defendants |
| No Construction | A shared signal line outside of the pixel array comprised of an electrically conductive material that carries the signal outputs of multiple column output amplifiers. |

All of the asserted claims of the '877 Patent require at least one "conductive channel" and a "pre-charging high-impedance pull-up amplifier" coupled to each such channel for "periodically charging up the one or more conductive channels." Exh. 1 at 3:4-16. It is undisputed that the claimed "conductive channel" refers to the signal line that is pre-charged by the claimed "pull-up." The dispute here is whether each pre-charged "conductive channel" is a shared signal line *outside* the array of pixels (Defendants' position), or could be *any* signal line, including signal lines *within* the pixel array (Panavision's position).

As demonstrated in Defendants' prior brief, Panavision clearly and unmistakably disclaimed any pre-charging of the signal lines *within* the pixel array during prosecution by distinguishing the claimed invention from prior art that showed pre-charging signal lines *within* the pixel array. Dkt. No. 105 at 4-5 (citing Ex. 5 at 89-90). Consistent with that disclaimer, inventor Boemler testified that in his invention, the pull-up is used to pre-charge the "video bus" located "*outside of the pixel array.*"[2] Exh. 9 at 61:22-63:2. Specifically, he testified that "[t]he conductive channels would be *outside* of the pixel area." *Id.* at 63:1-2; *see also id.* 60:6-13 (explaining that the claimed conductive channel is the "video bus").

| B. | Column | |
|---|---|---|
| Panavision | Defendants | |
| One or more pixels on an axis | In an array of pixels, all of the pixels within any vertical line that intersects the rows of the array. | |

---

[2] Emphasis added throughout.

The asserted claims of the '877 Patent also require that the claimed image sensor include "a plurality of column output amplifiers, each connected with a selected pixel of its associated *column*." See Exh. 1 at 3:7-9 (emphasis added). The parties dispute whether a "column" of an array includes *all* of the pixels within the vertical line or axis (Defendants' position), or can be *any grouping* of pixels (including just a single pixel) in the array (Panavision's position).

Inventor Boemler's testimony lays this dispute to rest. Specifically, Boemler testified that one of ordinary skill would understand the term "column" to refer not to just any random pixel or group of pixels as Panavision asserts, but rather to all of the pixels along a vertical axis. Exh. 9 at 52:4-17. Boemler explained that a pixel array for an image sensor includes "rows and columns like in an Excel spreadsheet," *id.* at 51:21-52:3, and that in this arrangement, "columns" refers to the pixels "going in a vertical direction" and "rows" to those in the "horizontal direction." *Id.* at 52:4-9. He further confirmed that each vertical column of the array "include[s] all the pixels in . . . the vertical axis." *Id*. at 52:10-13.

| C. | **Column Output Amplifiers, Each Connected with a Selected Pixel of its Associated Column, and Having a Low-Impedance Amplifier Device** |
|---|---|
| Panavision | Defendants |
| No Construction | This claim term is indefinite under 35 U.S.C. § 112, ¶ 2.<br><br>To the extent it can be construed at all it at least requires:<br><br>A set of amplifiers, each comprising circuitry located outside of the pixel array that amplifies the signals from each of the pixels in its associated column of the pixel array and having a low output impedance, which is a property related to the device's opposition to the flow of alternating current measured in ohms. |

As discussed below in Section III.D, this claim term is indefinite because the '877 Patent does not provide any basis for determining its scope.

To the extent it can be construed, the parties dispute whether a "*column output amplifier*" must be located *outside* of the array so that it may amplify the signals from each pixel within the column to which it is connected (Defendants'

position), or can be *any* amplifier located *within or outside* the array and connected to *any* number of pixels from *any* number of columns (Panavision's position).

Inventor Boemler's testimony confirms that a person of skill in the art would not have understood a "column output amplifier" to mean just any pixel amplifier, as Panavision contends. Rather, consistent with the intrinsic record, inventor Boemler explained that this was a commonly used term (Exh. 9 at 57:7-15), and would be understood to those of ordinary skill as a set of amplifiers *outside* of the array, each of which is capable of amplifying any of the pixel signals from the particular column with which it is associated. *Id.* at 53:13-21.

| D. | A Pre-Charging High-Impedance Pull-Up Amplifier | |
|---|---|---|
| | Panavision | Defendants |
| | No Construction | This claim term is indefinite under 35 U.S.C. § 112, ¶ 2.<br><br>To the extent it can be construed at all it at least requires:<br><br>An amplifier device that raises the voltage on the conductive channel(s) to a more positive reference voltage prior to each connection of a column output amplifier to the conductive channel(s). The output impedance, which is a property related to the device's opposition to the flow of alternating current measured in ohms, of the "pre-charging high-impedance pull-up amplifier" must be higher than the output impedance of the column output amplifier. **The pull-up amplifier cannot be a switch.** |

There are four disputes regarding this claim term: (1) does the patent provide any basis for determining the scope of the "high-impedance" limitation (Defendants contend it does not); (2) did Panavision relinquish switches from the scope of this term during the reexamination (Defendants contend it did); (3) does *pre*-charging require that the pull-up occur *prior* to the time when the conductive channel is charged by the column output amplifier (Defendants' position), or can it occur while the conductive channel is being charged by the column output amplifier (Panavision's position); and (4) must the "pull-up amplifier" actually "pull-up" the voltage of the conductive channel (Defendants' position), or can it cover an amplifier that does the *opposite* and pulls *down* the voltage (Panavision's position).

The first three disputes are addressed in more detail below; the fourth is addressed fully in Defendants' prior brief.

### 1. The Asserted Claims Are Indefinite Because The Patent Does Not Provide Any Basis For Determining The Scope Of The High-Impedance Limitation

The issue of indefiniteness is "inextricably intertwined" with claim construction. *Atmel Corp. v. Info. Storage Devices, Inc.*, 198 F.3d 1374, 1379 (Fed. Cir. 1999). This is because indefiniteness is a question of law drawn from the Court's performance of its duty as the construer of patent claims. *Biomedino, LLC v. Waters Techs. Corp.*, 490 F.3d 946, 949 (Fed. Cir. 2007).

As Defendants explained in their prior brief, the patent does not allow one of ordinary skill in the art to determine whether the impedance of an amplifier is "high," as required when words of degree are used.[3] *See Datamize LLC. v. Plumtree Software, Inc.*, 417 F.3d 1342, 1351 (Fed. Cir. 2005); *see also Halliburton Energy Services, Inc. v. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008) (explaining that a claim term is indefinite where "a skilled artisan could not discern the boundaries of the claim based on the claim language, the specification, and the prosecution history, as well as her knowledge of the relevant art area"). Panavision's refusal, or inability, to offer a construction of this limitation leads to the exact problem the definiteness requirement is designed to prevent: "unreasonable advantages to the patentee and disadvantages to others arising from uncertainty as to their [respective] rights." *Athletic Alternatives, Inc. v. Prince Mfg., Inc.*, 73 F.3d 1573, 1581 (Fed. Cir. 1996).

As explained in more detail in Defendants' co-pending motion for summary judgment of indefiniteness, inventor Boemler's testimony confirms that one of

---

[3] Likewise, the specification does not provide any basis to determine whether impedance is "low" with respect to the "column output amplifier" term.

ordinary skill in the art would not be able to determine what constitutes a "high-impedance" pull-up in the context of the claimed invention. In fact, Boemler conceded that the impedance would have to be "very, very low" in order to pre-charge "between connections of the switching means" as the asserted claims require.[4] Exh. 9 at 47:24-48:21; 63:12-64:17; 68:7-17; 263:2-20; 265:8-16; 266:5-267:3. This is because, as explained by the specification and confirmed by inventor Boemler, the time interval between connections of the switching means is "very short" (*see id.*; *see also* Exh. 1 at 2:5-11, 2:56-61), and it is undisputed that pre-charging takes a very long time when the impedance is high due to the higher resistance to the flow of current. Exh. 11 (Script of Panavision Technology Tutorial) at ¶¶ 22-25.

### 2. Panavision Disclaimed A Switch As Having A Low Impedance

Panavision's contention that a high-impedance pull-up can have a *lower* impedance than the low-impedance column output amplifier highlights the lack of logic of Panavision's position. Dkt. No. 112 at 10. At the very least, "high" must mean higher than "low." In addition, the high-impedance pull-up cannot cover a switch, because Panavision clearly and unmistakably distinguished a switch during the reexamination as necessarily having a low impedance. *See* Exh. 12 (March 29, 2010 Office Action Response) at 14-15). Having done so, Panavision relinquished switches from the scope of this term. *Chimie*, 402 F.3d at 1384. Defendants have modified their original construction accordingly (adding the bold language).

---

[4] This "discrepancy" was confirmed by the Patent Office. Exh. 10 ('877 Revised Action Closing Prosecution) at 6-8. However, because the issue of indefiniteness is beyond the scope of reexamination jurisdiction, the Patent Office was unable to reject the claims on this basis. *Id.* Instead, the Examiner advised Panavision that "it may be desirable to consider filing a reissue application." *Id.* at 8.

### 3. Pre-Charging Must Occur Before A Column Output Amplifier Is Connected To The Conductive Channel

Defendants' proposed construction requiring that the claimed "*pre*-charging" occur *before* a column output amplifier has been connected to the conductive channel (*i.e.,* video bus) is consistent with Panavision's own statements to the Patent Office during the reexamination.

Specifically, Panavision explained to the Patent Office that one of the ways the claimed invention conserves power is by having the pull-up charge the conductive channel *only* during the times that pixel information is not being transferred, i.e., *before* the switching means are connected. Exh. 12 at 1-2 ("*The required power is also kept low because amplifier 15 needs to charge bus 13 only in the 'dead-band,' when pixel information is not being transferred.*"). It is undisputed that this "dead-band" time frame occurs *only* when the switching means are open. Exh. 11 at ¶¶39-40. This is precisely the requirement specified by Defendants' construction and now dictated by Panavision's recent reexamination arguments to the Patent Office.

| E. | Periodically Charging Up the One or More Conductive Channels Between Connections of Said Switching Means | |
|---|---|---|
| | Panavision | Defendants |
| | No Construction | Activating the pre-charging high-impedance pull-up amplifier at regular intervals that do not overlap with when any of the switching means is closed. |

The asserted claims require that the claimed pull-up periodically charges up the "one or more conductive channels *between connections*" of the switching means. Exh. 1 at 3:13-16. The dispute here is whether this pre-charging occurs when the switching means are open (*i.e.,* when the column output amplifiers are *not connected* to the video bus) (Defendants' position), or may occur at any time, including when the switching means are *connected* (Panavision's position).

As demonstrated above, Panavision's statements to the Patent Office during

1 reexamination confirm that the pull-up amplifier charges the conductive channel 2 *only* when pixel information is not being transferred, *i.e.*, when the switching means 3 are open. *See* Section III.D.2, *supra*. Inventor Boemler likewise testified that the 4 pull-up will only pre-charge the conductive channel during the short interval of 5 time when "all of the switches are open." Exh. 9 at 63:21-24.

| F. | **Switching means for selectively connecting outputs of the column amplifiers to said one or more conductive channels** | |
|---|---|---|
| | Panavision | Defendants |
| | Function: no construction required<br>Structure: Select 1, Select 2, . . . Select n; or transmission gates | Function: connecting and disconnecting, one at a time, the output from each of the column output amplifiers to the conductive channel(s).<br>Structure: a row of column select switches (Select 1, Select 2, . . . Select n, a transmission gate) one for each column amplifier, which when closed physically connects the output of its associated column output amplifier to the conductive channel(s). **The row of column select switches constitutes the only circuitry between the column output amplifiers and each conductive channel.** |

The parties agree that this is a means-plus-function term that should be construed pursuant to §112, ¶6. They disagree however, regarding how to construe the claimed function and what constitutes the corresponding structure.

Based on how Panavision distinguished the prior art during reexamination, Defendants have modified their original proposed construction (adding the language in bold). Specifically, during reexamination, Panavision distinguished the Sauer prior art reference by asserting that Sauer, in contrast to the claimed invention, includes additional circuitry *between* the column output amplifiers and each conductive channel. Exh. 12 at 4-5. By clearly and unmistakably distinguishing the claimed invention in this way, Panavision disclaimed any column select switches that do not constitute the only circuitry between the column output amplifiers and each conductive channel. *See Chimie*, 402 F.3d at 1384.

## IV. <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that the Court enter an order adopting their proposed constructions for U.S. Patent No. 6,818,877.

|   |   |   |
|---|---|---|
| | | Respectfully submitted, |
| Dated:  December 22, 2010 | | WEIL, GOTSHAL & MANGES LLP |
| | | By: _____/s/ Jared Bobrow_____ |
| | | Jared Bobrow |

JARED BOBROW (Bar No. 133712)
*jared.bobrow@weil.com*
PARKER C. ANKRUM (Bar No. 261608)
*parker.ankrum@weil.com*
WEIL, GOTSHAL & MANGES LLP
Silicon Valley Office
201 Redwood Shores Parkway
Redwood Shores, CA  94065
Telephone: (650) 802-3000
Facsimile: (650) 802-3100

Attorneys for Defendants and Counterclaim Plaintiffs
MICRON TECHNOLOGY, INC.,
APTINA IMAGING CORPORATION, and
APTINA, LLC

By: _____/s/ James C. Yoon_____
James C. Yoon

Ron E. Shulman
*rshulman@wsgr.com*
James C. Yoon
*jyoon@wsgr.com*
WILSON SONSINI GOODRICH & ROSATI
650 Page Mill Road
Palo Alto, California 94304-1050
Telephone: (650) 493-9300
Facsimile: (650) 565-5100

Attorneys for Defendant and Counterclaim Plaintiff OMNIVISION TECHNOLOGIES, INC.

1

2   By: ___*/s/ Seth E. Freilich*___
3   Seth E. Freilich

4   Seth E. Freilich
5   *sfreilich@orrick.com*
    ORRICK, HERRINGTON & SUTCLIFFE LLP
6   777 South Figueroa Street, Suite 3200
7   Los Angeles, California 90017-5855
    Telephone: (213) 629-2020
8   Facsimile: (213) 612-2499

9
    Joseph A. Calvaruso
10  *jcalvaruso@orrick.com*
    Rodger A. Sadler
11  *rsadler@orrick.com*
12  Richard Martinelli
    *rmartinelli@orrick.com*
13  ORRICK, HERRINGTON & SUTCLIFFE LLP
14  51 West 52nd Street
    New York, New York 10019-6142
15  Telephone: (212) 506-5000
16  Facsimile: (212) 506-5151

17
    Attorneys for Defendant
18  CANON U.S.A., INC.

19

20

21

22

23

24

25

26

27

28

**DEFENDANTS' OPENING SUPPLEMENTAL CLAIM CONSTRUCTION BRIEF OF U.S. PATENT 6,818,877**       **CASE NO. CV09-1577 MRP (CTX)**